ECF, RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:09-cv-01185-JFK

Germino v. Merck & Co., Inc.

Assigned to: Judge John F. Keenan

Related Case: 1:06-md-01789-JFK -JCF

Cause: 28:1332 Diversity-Personal Injury

Date Filed: 02/10/2009

Jury Demand: Defendant

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**Virginia Lee Germino**                  represented by   **David Bagley Rheingold**
Rheingold,Valet, Rheingold, Shkolnik & McCartney, LLP
113 East 37th Street
New York, NY 10016-3042
(212)-684-1880
Fax: (212)-689-8156
Email: drheingold@rheingoldlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Merck & Co., Inc.**                      represented by   **David J. Heubeck**
Venable LLP (Baltimore)
Two Hopkins Plaza
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
(410)-244-7731
Fax: (410)-244-7742
Email: djheubeck@venable.com
*ATTORNEY TO BE NOTICED*

**Paul F. Strain**
Venable LLP (Baltimore)
Two Hopkins Plaza
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
(410)-244-7717
Fax: (410)-244-7742
Email: pfstrain@venable.com
*ATTORNEY TO BE NOTICED*

**Theodore VanHuysen Mayer**
Hughes Hubbard & Reed LLP (NY)

One Battery Park Plaza
New York, NY 10004
(212)837-6000
Fax: (212)422-4726
Email: mayer@hugheshubbard.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/10/2009 | 1 | COMPLAINT against Merck & Co., Inc. (Filing Fee $ 350.00, Receipt Number 677485)Document filed by Virginia Lee Germino.(ama) (Entered: 02/11/2009) |
| 02/10/2009 | | SUMMONS ISSUED as to Merck & Co., Inc. (ama) (Entered: 02/11/2009) |
| 02/10/2009 | | CASE REFERRED TO Judge John F. Keenan as possibly similar to 06MD1789. (ama) (Entered: 02/11/2009) |
| 02/10/2009 | | Case Designated ECF. (ama) (Entered: 02/11/2009) |
| 03/02/2009 | | CASE ACCEPTED AS RELATED. Create association to 1:06-md-01789-JFK-JCF. Notice of Assignment to follow. (mbe) (Entered: 03/13/2009) |
| 03/02/2009 | 2 | NOTICE OF CASE ASSIGNMENT to Judge John F. Keenan. (mbe) (Entered: 03/13/2009) |
| 03/02/2009 | | Magistrate Judge James C. Francis is so designated. (mbe) (Entered: 03/13/2009) |
| 03/16/2009 | 3 | NOTICE OF APPEARANCE by David J. Heubeck on behalf of Merck & Co., Inc. (Heubeck, David) (Entered: 03/16/2009) |
| 03/16/2009 | 4 | NOTICE OF APPEARANCE by Paul F. Strain on behalf of Merck & Co., Inc. (Strain, Paul) (Entered: 03/16/2009) |
| 03/16/2009 | 5 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Document filed by Merck & Co., Inc..(Mayer, Theodore) (Entered: 03/16/2009) |
| 03/16/2009 | 6 | ANSWER to Complaint with JURY DEMAND. Document filed by Merck & Co., Inc.. (Attachments: # 1 Certificate of Service)(Mayer, Theodore) (Entered: 03/16/2009) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/22/2011 14:53:27 | | | |
| **PACER Login:** | sa0050 | **Client Code:** | 962000-00201 Greenstein |
| **Description:** | Docket Report | **Search Criteria:** | 1:09-cv-01185-JFK |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

09 CV 1185

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
VIRGINIA LEE GERMINO,

                                Plaintiff,

- against -

MERCK & CO., INC.

                                Defendant.
-----------------------------------------------------------X

Docket No.:

**COMPLAINT**

Jury Trial Demanded

Plaintiffs, by and through their attorneys, Rheingold, Valet, Rheingold Shkolnik & McCartney LLP state as follows:

## I. PARTIES

1. Plaintiff Virginia Lee Germino is a citizen of the state of Virginia and resident of the city of Charlottesville.

2. At all relevant times, Defendant Merck & Co., Inc. ("Merck") was engaged in the design, manufacture, testing, marketing, distribution and sale of prescription drugs including FOSAMAX. Merck is incorporated in the state of New Jersey with its principal place of business in that state.

## II. JURISDICTION & VENUE

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars.

4. This court has diversity jurisdiction by virtue of 28 U.S.C. §1332.

5. This court has venue pursuant to 28 U.S.C. §1391.

6. This action includes claims for injuries to Virginia Lee Germino caused by her ingestion of FOSAMAX and therefore should be, and Plaintiff consents to, transfer to

1

**Multidistrict Litigation No. 1789 In Re: Fosamax Product Liability Litigation,** United States District Court, Southern District of New York.

### III. SUMMARY OF THE CASE

7. Defendant, either directly or through its agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed and sold FOSAMAX for the treatment of osteoporosis, Paget's Disease, and other uses.

8. As a result of the defective nature of FOSAMAX, persons who were prescribed and ingested FOSAMAX for several years, including Plaintiff Virginia Lee Germino, have suffered and may continue to suffer severe and permanent injuries, including weakened or brittle bones and multiple stress fractures as a result of FOSAMAX-induced severely suppressed bone turnover.

9. Defendant concealed and continues to conceal its knowledge of FOSAMAX's lack of long-term benefit and unreasonably dangerous risks from Plaintiff Virginia Lee Germino, other consumers, and the medical community. Specifically, Defendant has yet to adequately inform consumers and the prescribing medical community about the well established risks of long-term FOSAMAX use including severely suppressed bone turnover resulting from a condition known as Fosamax toxicity.

10. Defendant failed to conduct adequate and sufficient post-marketing surveillance of FOSAMAX after it began marketing, advertising, distributing and selling the drug.

11. As a result of Defendant's action and inaction, Plaintiff Virginia Lee Germino was injured due to her ingestion of FOSAMAX, which caused and will continue to cause Plaintiff various injuries and damages. Plaintiff accordingly seek compensatory damages, statutory damages, and punitive damages.

12. At all times Defendant was responsible for, or involved in, designing, manufacturing, marketing, advertising, distributing, and selling FOSAMAX.

13. In September 1995, the United States Food and Drug Administration ("FDA") approved Merck's compound alendronate for various uses, including the treatment of osteoporosis and Paget's Disease. Alendronate is marketed by Defendant Merck FOSAMAX.

14. FOSAMAX falls within a class of drugs known as bisphosphonates. Bisphosphonates are used for treating bone conditions such as osteoporosis and Paget's Disease. Other drugs within this class, such as Aredia and Zometa, are used as chemotherapy and adjunct chemotherapy but are not indicated for use in non-cancerous conditions such as osteoporosis.

15. There are two classes of bisphosphonates: the N-containing (nitrogenous) and non-N-containing (non-nitrogenous) bisphosphonates. The nitrogenous bisphosphonate include the following: pamidronate (Aredia); ibandronate (Bondronat); and alendronate (FOSAMAX). The non-nitrogenous bisphosphonates include the following: etridonate (Didronel); clodronate (Bonefos and Loron); and tiludronate (Skelid). Alendronate contains nitrogen atom.

16. FOSAMAX works by inhibiting bone resorption and suppressing bone turnover. Bone mineralization occurs in two phases. Primary mineralization occurs while new bone is forming. Because FOSAMAX severely suppresses bone turnover, bone remodeling and primary mineralization are inhibited. Secondary mineralization of existing bone however, continues to occur. This results in an increase in the tissue mineral content of the bone which translates to a an increase in bone mineral density ("BMD"). Increased BMD does not necessarily correspond with reduction of fracture risk. Additionally, through the bisphosphonate action, bone becomes highly mineralized, homogenous, brittle, and more susceptible to fracture.

3

17. Prior to the introduction of FOSAMAX, the diagnosis of osteoporosis included clinical criteria such as prior bone fracture. Through the use of the 1990s advent of BMD-based diagnosis for osteoporosis, the number of women diagnosed with osteoporosis skyrocketed. The BMD diagnostic criteria for osteoporosis have not been proven to correspond to those women who are most at risk for fracture. Upon information and belief, due to the widespread over-prescription of osteoporosis medications, including FOSAMAX, World Health Organization is currently investigating the use of the arbitrary standard-deviation system for the BMD-based diagnosis of osteoporosis.

18. As medical researchers have concluded: " The use of surrogate endpoints such as BMD to predict fracture reduction risk should be approached with caution, as the relationship between BMD changes and fracture risk reduction with antiresorption therapies (such as FOSAMAX) is uncertain." Marcus, R., et al., *Anti-Resorptive Treatment of Post-Menopausal Osteoporosis: Comparison of Study Designs and Outcome in Large Clinical Trials with Fracture as an Endpoint,* 23 Endocrine Rvws. 16-37 (2002)

19. Numerous studies have confirmed that the effects of FOSAMAX on bone continue for years after treatment is discontinued. One study showed that bone turnover was still inhibited by more than 50% five years after the discontinuation of FOSAMAX therapy. Strewler, G., *Decimal Point- Osteoporosis at the 10 year mark,* 350 N. Engl.J. Med. 1172 (2004). Merck's own studies reveal that FOSAMAX has a half-life in bone of greater than ten years.

20. Defendant knew or should have known that by inhibiting bone turnover while at the same time allowing the secondary mineralization of old bone to continue, long term FOSAMAX therapy would result in bones becoming highly mineralized, brittle and more susceptible to

4

fracture.  This is especially true given the fact that the effects of FOSAMAX on the bone accumulate and continue for years after treatment is discontinued.

21.  Defendant promoted  FOSAMAX as an effective treatment for osteoporosis that significantly reduced the risk of fracture in post-menopausal women.

22.  Defendant's 1997 Fracture Intervention Trial ("FIT") reported a 47% reduction in the risk of new vertebral fractures and a 28% reduction in the risk of clinical fractures in postmenopausal women taking alendronate compared to those taking a placebo.  Ensrud et al., *Treatment with Alendronate Prevents Fractures in Women in Highest Risk*, 157 Arch. of Int. Med. 2617 (Dec. 8/22,1977)

23.  Medical researchers in the January 19, 2008, issue of the British Medical Journal revealed the manner is which bisphosphonates such as FOSAMAX are presented to reduce fracture risk for those woman who actually do have osteoporosis tends to exaggerate the actual fracture reduction benefit conferred.  According to the authors, published clinical trials exaggerated the fracture-reduction benefits through the use of relative risk rather than in terms of absolute risk.  As the author state: "Impressive sounding reductions in relative risk can mask much smaller reductions in absolute risk." By using the math of "relative risk" rather than "absolute risk", the purported benefits of the drugs appear larger than they actually are in the general population.  As a result, billions of dollars are being spent on a drug that has questionable utility for the ultimate goal of fracture reduction.

24.  Correspondingly, when examined in a clinical setting, later observational studies revealed that the FIT study exaggerated the benefit derived from alendronate therapy in reducing the risk of fracture. The 2006 ICARO study concluded that the incidence of fractures during treatment with antiresorptive agents, including FOSAMAX, in clinical setting is considerably

higher than that observed in randomized clinical trials, especially when therapy was not supplemental with calcium and vitamin D. Silvano et al., *Fracture Incidence and Characterization in Patients on Osteoporosis Treatment: The ICARO study* , 21 J. Bone and Mineral Research 1565 (2006).

25. Long term studies of the effects of FOSAMAX therapy revealed that the benefits of remaining on FOSAMAX for longer than 5 years were limited. One study, known as the FLEX study, concluded that while women who discontinued FOSAMAX after 5 years of therapy experienced moderate decline in BMD, their BMD remained above baseline and they did not experience a significant increase in the number of fractures when compared to women who continued FOSAMAX therapy for more than 5 years. Black et al., *Effects of Continuing or Stopping Alendronate After 5 Years of Treatment,* 296 JAMA 2927 (2006). The results of this study suggested continuing FOSAMAX therapy for more than 5 years likely does not benefit the majority of women taking the drug. It was also observed in this study that during the later years of the study, the non-vertebral fracture rate of women on alendronate appeared to be the same or higher than during the first three years of alendronate therapy, despite the higher bone density levels.

26. Merck has been aware of sound scientific and medical evidence that safer alternative therapies, such as Vitamin D and calcium supplements, effectively reduce the risk of non-vertebral fractures without the harmful side effects that can result from long-term FOSAMAX use. For example, results of a three year study of the effect of calcium and vitamin D supplementation on bone density showed that women taking calcium and vitamin D supplements had significantly less total body bone loss and substantially fewer fractures compared to women in the placebo group. Hughes et al., *Effects of Calcium and Vitamin D Supplementation on Bone*

*Density in Men and Women 65 Years of Age and Older*, 337 N. Engl. J. Med. 670 (1997). The percentage of fracture reduction closely follows that presented in Merck's studies.

27. Despite evidence of the positive effects of vitamin D and calcium on bone health and fracture risk, along with evidence of reduced efficacy of FOSAMAX when not supplemented with vitamin D and calcium, Defendant has never done a head-to-head comparative study of treatment with FOSAMAX alone versus treatment with vitamin D and calcium alone.

28. Rather than evaluating and verifying the safety of long-term FOSAMAX use with respect to bone strength and stress fractures, Defendant proposed further uses of FOSAMAX, such as FOSAMAX -D, and sought to extend th exclusivity period of FOSAMAX through 2018.

29. Over the last few years, there have been an increasing number of reports of patients suffering multiple stress fractures as a result of severely suppressed bone turnover resulting from long-term FOSAMAX use. Severely suppressed bone turnover from long-term FOSAMAX use has been well recognized in the medical literature.

30. There is also evidence from at least one animal study that severe suppression of bone turnover and bone remodeling that occurs with alendronate therapy, can result in the accumulation o of microdamage in bone as well as a reduction in some of the biomechanical properties of bone. Mashiba et al., *Suppressed Bone Turnover by Bisphosphonates Increases Microdamage Accumulation and Reduces Some Biomechanical Properties in Dog Rib*, 15J. Bone and Mineral Research 613 (2000). These findings were further reflected in human studies: "Our finding raise the possibility that severe suppression of bone turnover may develop during long-term alendronate therapy, resulting in increased susceptibility to, and delayed healing of, nonspinal fractures." Odvina, Clarita V/., et al., *Severely Suppressed Bone Turnover: A*

*Potential Complication of Alendronate Therapy*, 90 J. Clin. Endocrinol. Metab. 1294-1301 (2005).

31. On January 7, 2008, the FDA issued a medical advisory warning doctors and FOSAMAX patients of the "possibility of severe and sometimes incapacitating bone, joint, and/or muscle pain" and advising physicians to discontinue prescribing FOSAMAX if such complaints occurred during therapy. One week later, the January 15, 2008 *Journal of Rheumatology* article concluding that FOSAMAX patients have a 287% higher chance of developing osteonecrosis (jaw, hip and knee) than those not taking the drug. In light of the ever-increasing skepticism about the actual benefits conferred by FOSAMAX , and the growing number of risks, perhaps it's finally time for Merck to give up the ghost FOSAMAX .

32. Despite its knowledge of this dangerous side effect that can result from long-term FOSAMAX use, Defendant refuses to warn patients, physicians and the medical community about the risk of severely suppressed bone turnover. Defendant continues to defend FOSAMAX, mislead physicians and the public, and minimize unfavorable findings.

33. FOSAMAX is one of Defendant's top selling drugs, averaging more than $3 billion a year in sales.

34. Consumers, including Plaintiff Virginia Lee Germino, who have used FOSAMAX for treatment of osteoporosis, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits associated with long-term FOSAMAX therapy.

35. Defendant knew of the significant risk of severely suppressed bone turnover, brittle bones and multiple stress fractures that could result from long-term FOSAMAX use, but

Defendant did not adequately and sufficiently warn consumers, including Virginia Lee Germino, her physicians or the medical community.

36. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff Virginia Lee Germino and her physicians the true and significant risks associated with long-term FOSAMAX use.

37. As a result of Defendant's actions, Plaintiff Virginia Lee Germino and her prescribing physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks identified in this complaint, and that those risks were the direct and proximate result of Defendant's acts, omissions, and misrepresentations.

38. Plaintiff Virginia Lee Germino was prescribed and began taking FOSAMAX in 2001.

39. Plaintiff Virginia Lee Germino used FOSAMAX as prescribed and in a foreseeable manner consistently from December 2001 through July 2008.

40. On April 15, 2008, plaintiff Virginia Lee Germino suffered a subtrochanteric left hip fracture.

41. As a direct result, Plaintiff Virginia Lee Germino was prescribed FOSAMAX for almost six years and has been permanently and severely injured, having suffered serious consequences from long-term FOSAMAX use. Plaintiff Virginia Lee Germino requires and will in the future require ongoing medical care and treatment.

42. Plaintiff Virginia Lee Germino, as a direct and proximate result of long-term FOSAMAX use, suffered severe mental and physical pain and suffering and has sustained

permanent injuries and emotional distress.

43.  Plaintiff Virginia Lee Germino would not have used FOSAMAX for so many years had Defendant properly disclosed the risks associated with its long-term use.

## IV.    FIRST CAUSE OF ACTION - NEGLIGENCE

44.  Plaintiffs repeat and reallege paragraphs 1 through 43..

45.  Defendant Merck was negligent in designing, testing, manufacturing, marketing, distributing and selling FOSAMAX with defects.

46.  Upon information and belief, Defendant Merck had knowledge of said defects prior to designing, manufacturing, marketing and selling FOSAMAX, yet failed to correct said defects or otherwise improve the safety of FOSAMAX.

47.  As a proximate result of the aforementioned negligence of Defendant, Annette Gross suffered severe, acute and permanent injuries, including, but not limited to, conscious pain and suffering.

48.  The conduct of Defendant was so willful, wanton, malicious, reckless and in such disregard for the consequences as to reveal a conscious indifference to the clear risk of serious bodily injury, and merits the imposition of punitive damages.

49.  Defendant Merck is therefore liable to Plaintiffs.

## V.    SECOND CAUSE OF ACTION - STRICT PRODUCTS LIABILITY

50.  Plaintiffs repeat and reallege paragraphs 1 through 49.

51.  FOSAMAX was defective and unreasonably dangerous when Merck placed it into

the stream of commerce.

52. Plaintiff's injuries were a proximate result of one or more of said defects.

53. The conduct of Defendant was so willful, wanton, malicious, reckless and in such disregard for the consequences as to reveal a conscious indifference to the clear risk of serious bodily injury, and merits the imposition of punitive damages.

54. By engaging in the aforesaid conduct, Defendant Merck is are strictly liable to Plaintiffs.

## VI.   THIRD CAUSE OF ACTION - BREACH OF WARRANTY

55.    Plaintiffs repeat and reallege paragraphs 1 through 54.

56.    Defendant breached the applicable warranties, express and implied, and is therefore liable to Plaintiffs.

## VII.  FOURTH CAUSE OF ACTION - FRAUD AND MISREPRESENTATION

57.    Plaintiff repeats and reallege paragraphs 1 through 56.

58.    Defendants deliberately and carelessly made false and misleading statements about the safety of the product, on which plaintiff and their prescribing doctor relied to her detriment.

59.    Defendants concealed research which it did or had done for it, or changed it before presentation to the FDA or for publication so as to minimize health hazard, and caused to be published articles unjustifiably representing the safety of the product.

WHEREFORE, Plaintiffs demand judgment against Defendant for:

a. Compensatory damages against Defendant on Causes of Action One and Two each in the amount of TWENTY MILLION ($20,000,000.00) DOLLARS;

b. Compensatory damages against Defendant on Cause of Action Three in the amount of

FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS;

c.  Punitive damages against Defendant on Causes of Action One and Two each in the

amount of TWENTY MILLION ($20,000,000.00) DOLLARS;

d.     All together with interest, costs and disbursements;

e.     Such other and further relief as this Court deems just and proper.

Dated: New York, New York
        February 3, 2009

David B. Rheingold  4676
Rheingold, Valet, Rheingold,
Shkolnik & McCartney LLP
ATTORNEYS FOR PLAINTIFFS
113 East 37th Street
New York, New York 10016
(212) 684-1880